[Cite as *In re T.T.*, 2017-Ohio-912.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

IN RE: T.T.

C.A. No.     28416

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.     DN 14-04-0198

DECISION AND JOURNAL ENTRY

Dated: March 15, 2017

HENSAL, Presiding Judge.

{¶1}    Appellant, Liem T. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights and placed his minor child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.

I.

{¶2}    Father is the biological father of T.T., born October 25, 2010. The child's mother ("Mother") did not appear at the permanent custody hearing or appeal from the trial court's judgment. According to a notice filed by Father during this appeal, Mother is now deceased.

{¶3}    T.T. has four older half-siblings, who are not Father's children and are not parties to this appeal. T.T. was born in California, where he resided with Mother, his half-siblings, and the father of the half-siblings. Shortly after T.T. was born, Mother moved to Summit County

with T.T., his half-siblings, and the father of the older half-siblings. Father remained in California.

**{¶4}** CSB first became involved with this family during 2012, based on concerns that the children were being neglected and the older children were being abused by Mother. Mother and the other father worked on a case plan and the children were eventually returned to Mother's custody. During the year that the prior case was open, Father made one four-day trip to this area to visit T.T. and expressed his agreement with returning the child to Mother's custody. Although the court placed T.T. in the joint legal custody of Mother and Father, the child lived with Mother and the father of his half-siblings in Summit County and had little contact with Father. The prior case was closed during January 2014.

**{¶5}** Three months later, T.T. and his four older half-siblings were removed from the home of Mother and the father of the half-siblings pursuant to Juvenile Rule 6. CSB filed a complaint to allege that T.T. was a dependent child because Mother had physically abused two of T.T.'s older half-siblings and that she suffered from serious mental health problems. At that time and throughout these proceedings, Father continued to reside in California.

**{¶6}** T.T. was later adjudicated a dependent child and placed in the temporary custody of CSB. Mother was not permitted to have unsupervised contact with her children because, as the caseworker explained, she had "tortured [some of her older children] in a sadistic manner." CSB was also concerned about Mother's untreated mental health and substance abuse problems. The children were temporarily placed with a maternal relative but were later removed from that home because the relative was allowing Mother to have unsupervised access to the children. T.T. was eventually placed in a foster home with his four older half-siblings. All five children continued to reside in that home throughout the remainder of the proceedings.

{¶7}    Although Mother made initial progress on the case plan, she later stopped working toward reunification and eventually lost all contact with CSB, the guardian ad litem, and the court.    Because the father of the older four children expressed an interest in providing a home for all five children, CSB refocused its reunification efforts on him.  Although he is not T.T.'s biological father, T.T. had always considered him a father-figure because he had lived with him and his contact with Father had been minimal.

{¶8}    During this case, Father came from California for the adjudicatory and dispositional hearings.  During his stay here, he visited with T.T. and filed a motion for legal custody of the child, but he then returned to California and did not pursue his request for custody.  According to the caseworker, although Father expressed an initial interest in custody of T.T., he did not want to take the child to California with him at that time, but instead supported the requests of Mother and/or maternal relatives for custody of the child.

{¶9}    Throughout the next one and one-half years, Father failed to maintain contact with his trial counsel, CSB, the guardian ad litem, the court, or his child.   Because Mother and the father of the older children failed to make progress toward reunification, CSB eventually moved for permanent custody of T.T. and his four older half-siblings.

{¶10}  During February 2016, Father contacted CSB and again expressed interest in having custody of T.T.  Although CSB had not heard from Father for approximately 20 months, it arranged for him to visit T.T. during March 2016 while he was in town for a scheduled court hearing.  CSB offered Father the opportunity for an overnight visit with T.T., but Father did not want to visit the child without Mother to assist him.  The caseworker expressed concern that Father wanted Mother to be with T.T. and did not understand that she posed a threat to the child.

Father decided to have a two-hour visit with T.T. at the visitation center, which was Father's only interaction with T.T. during that trip to this area.

{¶11} Father had no other face-to-face contact with T.T. during this case. Although Father had expressed an interest to the foster mother in communicating with T.T. via internet video communication, and the foster mother attempted to facilitate those communications, Father did not follow through. Instead, Father's communication with T.T. for the next five months was limited to occasional telephone calls and five-year-old T.T. was often reluctant to speak to Father over the phone.

{¶12} Following a hearing held during August 2016, the trial court terminated Father's parental rights and placed T.T. in the permanent custody of CSB. Father appeals and raises one assignment of error.

## II.

## ASSIGNMENT OF ERROR

THE TRIAL COURT'S DECISION TERMINATING FATHER'S PARENTAL RIGHTS AND GRANTING PERMANENT CUSTODY OF THE CHILD TO [CSB] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶13} Father's sole assignment of error is that the trial court's permanent custody decision was against the manifest weight of the evidence. Before a juvenile court may terminate parental rights and award permanent custody of children to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the children are abandoned; orphaned; have been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; they or another child in a parent's custody have been adjudicated abused, neglected, or dependent on three separate occasions; or they cannot be placed with either parent within a reasonable time or should not be placed with either parent,

based on an analysis under Revised Code Section 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the children, based on an analysis under Section 2151.414(D). *See* R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 99 (1996).

{¶14} The trial court found that CSB satisfied the first prong of the permanent custody test because T.T. had been in the temporary custody of CSB for 12 or more months of a consecutive 22-month period. Father does not dispute that finding. Father confines his challenge to the trial court's finding that permanent custody was in the best interest of T.T.

{¶15} When determining the child's best interest under Section 2151.414(D), the juvenile court must consider all relevant factors, including the interaction and interrelationships of the child, his wishes, the custodial history of the child, and his need for permanence in his life. *See In re R.G.,* 9th Dist. Summit Nos. 24834, 24850, 2009-Ohio-6284, ¶ 11. The trial court was also required to consider whether any of the factors in Section 2151.414 (E)(7) to (11) apply to the facts of the case. R.C. 2151.414(D)(1)(e). Of relevance here, the trial court found that Father had abandoned T.T. under Section 2151.414(E)(10).

{¶16} Because the trial court's finding that Father abandoned T.T. is closely related to the first best interest factor about the interaction and interrelationship between Father and T.T., this Court will consider those factors together. Father concedes that he abandoned T.T. for more than a year, but argues that he made subsequent efforts to reconnect with the child.

{¶17} The record reflects that Father's interaction with T.T. during this case and throughout the child's life was extremely limited. During the prior case and this case, CSB repeatedly attempted to facilitate increased interaction between Father and T.T., but Father

resisted those efforts. During the prior case, Father came to this area for several days but saw T.T. only once.

{¶18} Father visited T.T. once at the beginning of the case and had no further contact with him for the next one and one-half years. It was not until after CSB moved for permanent custody that Father again had any contact with CSB or T.T. Father visited T.T. during March 2016 and, although CSB wanted to extend his time with the child, Father declined CSB's offer for an overnight visit. He saw the child for one two-hour visit and then returned to California. By the end of this case, T.T. was five years old, had seen Father only a few times during his life, and had no parent-child bond with him.

{¶19} Father, who is Vietnamese and does not fluently speak English, suggests that CSB and/or the trial court may have improperly considered, or failed to reasonably accommodate, the language barrier between him and T.T., who speaks only English. The record reflects that both CSB and the trial court provided Father with an interpreter to facilitate communication with other parties to the proceedings. Nothing in the record suggests that a language barrier posed an obstacle to Father's ability to visit with his child. Although the trial court noted the language barrier in its judgment entry, that observation was made as part of the trial court's conclusion that Father had abandoned T.T., that there was no bond between them, and that Father's recent attempts to contact the child by telephone were further hampered by a language barrier between them.

{¶20} In stark contrast to his lack of a relationship with Father, the evidence demonstrated that T.T. was closely bonded to his four older half-siblings and the foster parents, with whom he had lived for the past 14 months. Witnesses testified that T.T. was doing well in the safe and structured environment in the foster home. The foster parents were interested in

adopting all five children. The foster mother, who herself is of Vietnamese heritage, had made efforts to expose T.T. to that culture.

{¶21} At the time of the permanent custody hearing, T.T. was only five years old, so the guardian ad litem testified on his behalf. The guardian ad litem expressed his opinion that permanent custody was in the best interest of T.T., so that he could be adopted by the foster parents along with his four older half-siblings. He emphasized that T.T. is confused about who Father is because he has had so little contact with him. As other witnesses had also testified, the only father figure in T.T.'s life was the father of his older half-siblings.

{¶22} During this case and the prior juvenile case, T.T. spent three of his five years living in the care of people other than his parents. Moreover, although Father had joint legal custody of T.T. for a period of time, T.T. has never resided in his physical custody and has had only minimal contact with him throughout his life. Because T.T. had been in and out of temporary placements throughout his life, he was in need of a legally secure permanent placement.

{¶23} The trial court reasonably concluded that a legally secure permanent placement would only be achieved by placing T.T. in the permanent custody of CSB. Because Father has failed to demonstrate any error in the trial court's permanent custody decision, his assignment of error is overruled.

III.

{¶24} Father's assignment of error is overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

JENNIFER HENSAL
FOR THE COURT

SCHAFER, J.
CALLAHAN, J.
CONCUR.

APPEARANCES:

DEREK CEK, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.

KANI HIGHTOWER, Attorney at Law, for Appellee.

RANDALL BRAY, Guardian ad Litem.